IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MAHENDRA KUMAR TRIVEDI, | : | Civil Action No. 4:11-CV-2390 |
| TRIVEDI FOUNDATION, | : | |
| TRIVEDI MASTER WELLNESS, | : | |
| LLC, | : | |
| Plaintiffs, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| TANIA M. SLAWECKI, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

December 3, 2014

## I.  BACKGROUND:

This is a curious and unfortunate action sounding in defamation. A self-proclaimed energy healer asserts that he can employ his powers to alter the molecular composition of water. A university research assistant not only derides this claim but publicly states that the healer lacks sexual mores.

On December 28, 2011, Plaintiffs, Mahendra Kumar Trivedi, Trivedi Foundation, and Trivedi Master Wellness, LLC (collectively "Trivedi"), commenced the instant action by filing a complaint.  Jurisdiction is predicated on diversity.   Trivedi filed an amended complaint on December 13, 2012. ECF No. 31.  Trivedi alleges that Defendant, Tania M. Slawecki (hereinafter "Slawecki"),

1

defamed him (Count I), committed tortious interference with contractual relations of affiliates (Count II), and  committed tortious interference with contractual relations with employees (Count III).

In response, Slawecki filed an amended answer on May 7, 2013, that asserts an abuse of process counterclaim against Plaintiffs.  ECF NO. 40.

Slawecki filed a motion for summary judgment on August 25, 2014.  ECF No. 64.  The motion has been fully briefed by the parties.  Additionally, the undersigned heard oral argument on the motion on October 29, 2014.  The matter is now ripe for disposition.

For the following reasons, the motion for summary judgment will be granted in part and denied in part.

## II.  DISCUSSION:

### A.  Undisputed Facts

Middle District Local Rule 56.1 requires the moving party to set forth a statement of facts to which the moving party contends there is no genuine issue to be tried.  The statement of facts is required to include references to the record to support the statement of facts.  Both parties failed to comply with the local rule.  Defendants provided only sixteen paragraphs of undisputed 'facts,' which are not actually the facts of the case, but a procedural history of the case, with no

references to the record.   Plaintiffs' response also contains no references to the record.

Defendant's document, with a lack of undisputed facts is insufficient, considering that it is defendant's burden to demonstrate the absence of disputed material facts.  Instead, defendant has merely provided the Court with a sparse recitation of the procedural history of the case.  Defendant did cite to the record in the briefs supporting the motion, but this is not as useful to the Court as the statement of material facts required by the rule, because there is not a meaningful way for plaintiff to then respond to the asserted statements of fact by admission or denials.  The manner in which the local rule has been written was done so in a considered deliberate manner specifically for the Court to determine the disputed, material facts with direction from the parties.  "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (Posner, J.).

However, despite the lack of a statement of the undisputed facts as required by the local rule from which the Court may recite the facts to write a lucid opinion, it is clear from oral argument that the same essential storyline unfolds regardless of whether it is plaintiffs' recitation or defendant's.   The dispute between the parties appears to center around the application of these facts to the law.

Accordingly, the following are the truffles[1] the Court has hunted for in the exhibits attached to the briefs and have discerned as the facts of the case.

Plaintiffs are Mahendra Kumar Trivedi, Trivedi Foundation, and Trivedi Master Wellness, LLC (collectively "Trivedi").  Mr. Trivedi founded the non-profit Trivedi Foundation and he controls the for-profit company, Trivedi Master Wellness. ECF No. 70-1 at 2 and 6.  Mr. Trivedi asserts that he received guidance from a "universal intelligence" that lead him to understand that he had been given the ability to transmit energy, such that his blessings can change the structure of the atoms that make up water.  ECF No. 70-1 at 3, and ECF No. 70-3 at 38-39 Pl.'s Responses to Defendant's Request for Admission.

In 2009, Mr. Trivedi "began research with Dr. Rustum Roy, director of The Pennsylvania State University's material research laboratory and arguable [sic] one of the world's experts on the molecular structure of water" ECF No. 76-1 at 3, Affidavit of Mahendra Kumar Trivedi.  Mr. Trivedi appeared to have the support of Dr. Roy.  *See* Letter purportedly directed to the department of Immigration and Naturalization Services from Dr. Roy, ECF No. 76-1 at 17.

---

[1]In addition to the lack of a statement of facts, defendants exhibits are confusing.  Exhibit A to ECF No. 70 is portions of the deposition of Mr. Trivedi. Exhibit B, then, starts as what appears to be, but is not labeled as such, as the deposition of Ms. Alice Branton, but then reverts back to pages from Mr. Trivedi's deposition.

Mr. Trivedi met Defendant, Tania M. Slawecki, Ph.D. (hereinafter "Slawecki"), through Dr. Roy.  Dr. Slawecki is a Research Associate with the Materials Research Institute at The Pennsylvania State University (hereinafter "Penn State") in State College, Centre County, Pennsylvania.  ECF. No. 7601 at 14.

There are two documents that appear to form the basis of Trivedi's claims against Dr. Slawecki.  The first is an article on the internet written by Dr. Slawecki that the parties have titled the  "overview."  The second is an email written by Dr. Slawecki on July 28, 2011.

*1. The Overview*

Dr. Slawecki has a link to a personal webpage that can be accessed through the official Penn State website.  Dr. Slawecki posted on her personal website an article that the parties describe as an "overview."  The overview was written after Dr. Roy's death. ECF No. 76-1 at 57.   The overview is an approximately 5 page article that Dr. Slawecki posted on her personal website titled "Overview and Summary of Research on Mahendra Trivedi Conducted at Penn State University in 2009" and is dated May 2011. ECF No. 76-1 at 68-73. The following are the excerpts from the overview written by Dr. Slawecki that are relevant to the instant motion:

Mahendra Trivedi was welcomed eagerly at our laboratory when he first arrived, for he came backed already by thousands of webpage documentation of "experiments" that "proved" he was able to affect [sic] physical materials with his unique abilities. Our investigative team was eager to substantiate his claims. We proceeded with open minds and spirits, very much wanting to be impressed or "wowed." We were left underwhelmed.

\*\*\*\*\*

[W]e did not observe any changes in materials or their properties as a result of his "blessings."

\*\*\*\*\*

It is important to note here that we WERE biased in our study: we WANTED to see a difference, even hopefully EXPECTED to see a difference, but, to our dismay, found nothing.

\*\*\*\*\*

Lots of data. We found nothing meaningful.

\*\*\*\*\*

As materials scientists, we were not trained to think critically about agricultural applications, but I happen to be a long-time organic biointensive mini-farmer and a member of the PA Association for Sustainable Agriculture. While detail is presented in the full research report I hope to eventually post, in short, one can conclude NOTHING from a single blessed vs. unblessed plant.

\*\*\*\*\*

So what is left to consider as scientifically valid about Trivedi? When he arrived at our office, he was drinking 17 liters of water a day and rarely using the bathroom. According to his followers, this was an

improvement over the 30 liters/day he used to consume!   He often perspired on his forehead and wiped his forehead often.  He constantly cleared his throat, as if chronically congested, and his voice was often gruff as if choked with phlegm.  His followers said he never slept - I observed his eyes were often bloodshot, yet he did not seem tired. Supposedly his physiological parameters were astounding: he should be in a diabetic coma or dead and yet he was not! His pituitary was the size of an egg! We had no way to confirm the medical data about Trivedi, but based upon his unusual water consumption alone, there was clearly something physiologically different about him.

Is his astounding physiology reason to become a follower of him? What is the significance of his unusual physiology?

I found the following passages potentially insightful on this front (having nothing to do with our laboratory testing.)   Consider the following Discourse 24 from Paramahansa Yogananda's book *The Second Coming of Christ*, which is a yogi's perspective and commentary on the Christian bible and the teachings of Jesus.  Discourse 24 is "Casting out Devils." While I don't care for some of the terminology Yogananda chooses to use, I share a few excerpts form pp.  400-402:

"As people walk in sleep or cry out during a bad dream, so, during the sleep after death, unclean spirits move about in the ether crying out for relief.  Often they try to get hold of some passive bodily vehicle through which to express their agony and pent-up wickedness."

"The evil-spirit-possessed person usually displays unusual physical strength, bloodshot eyes, uncanny expression, and general lack of normal behavior."

"A possessed individual may or may not be unconscious within his spirit-controlled body, just as a person under hypnosis may manifest the unconsciousness of sleep or the superficially normal state of the obsessed conscious mind."

"Jesus did not want the unclean devil, in its irritated state, to do harm to

7

the brain of the obsessed man.  If possession by unclean devils or disembodied souls continues for long, great mischief is done to the brain, mind, and sense organs of the possessed individual, posing a threat of the advent of permanent insanity.  By his life-controlling will power, Jesus spoke: *Hold thy peace and come out of him*.  That is, stop the devilish work of wrecking possessed brains; hold on to the inner peace of the soul, hidden behind the dark barrier of self-created past evil propensities, and restore again your right behavior by coming out of the body you have forcibly and unethically occupied.

Additional perspective on Trivedi's case may be gained by reading about "trance surgeons," as documented extensively by Prof. Norman Don at the University of Chicago.  I heard him speak at the First International Conference on the Science of Whole Person Healing in 2003, and it opened my eyes to this unconventional matter of "entities" that could partially or totally control another's body.  The healer Joao de Deus (John of God) is a well-documented case of a trance healer.  Trivedi's case is a very different form [than] that of Joao's, but one begins to get some perspective by learning about such things.

Severe dissociative disorder (SDD)[2], also called "Multiple Personality Disorder," is also relevant for perspective on this matter.  Some cases of SDD involve the spontaneous changing of one personality into another with a corresponding completely different physiology: eye color, blood type and physiology (including physical ailments) can change spontaneously, depending on the personality ("entity"?) animating the physical body.  According to a psychologist colleague, psychology textbooks cite such cases but have no explanation for how or why they occur.

We had a reputable clairvoyant watch and paint the energy field/aura of Trivedi in his normal state, while blessing samples, and while blessing

---

[2]Dr. Slawecki testified at her deposition that she has no training or expertise in SDD.  ECF No. 76-1 at 61.

people.  Trivedi, who initially poked fun at people who claim to be able to see auras, became visibly nervous when our clairvoyant prepared to paint his.  He repeated suggested she needed to take a walk to relax prior to doing this painting, until, at last, she replied that maybe HE needed to go take a walk.  He did.  He returned and she was able to proceed.

She saw a lower level entity (which she politely referred to as an ancestor spirit) with Trivedi in his normal state.  As Trivedi entered his trance state to bless samples, the entity seemed to enter through his throat chakra and began to pump power into and out of the solar plexus.  When Trivedi blessed people, his energy field resembled that of a shaman - the clairvoyant had only seen the same kind of field when shamans were working.  She said she detected "cunning" and commented "cunning can be good or cunning can be bad."  Her sense was that she did not trust him or his energy and she slipped away when he sought to bless her.

*****

If, in fact, one were to take this possibility as a valid one – that is, there is a disembodied spirit of some kind that seems to be working through Trivedi, entering through his throat chakra – his condition could be viewed as a kind of spirit possession case...

It is said that low level spirits who suffer from addictions will often attach themselves to incarnated persons to energetically satisfy their addictive cravings.  Trivedi speaks not of love (as do the Great Masters), but only of his Powers.  Thus one might be lead to believe that the entity working through him is addicted to power, fueling itself on the vital energy of others who openly and willingly submit to it...

*****

I worked with the late Prof. Rustum Roy...He (Rustum) subjected himself to many, many "blessings"...

We tested Trivedi, *gratis*, on several occasions, June-September 2009,

after which Trivedi was spending time in Arizona and California.  We had a potential funder (philanthropist) visit our lab in mid-December and this man also had training under a master in India who was both Sufi and Yogi.  In short, while telling him about our testing of Trivedi, this man detected the strong presence of a negative entity in our lab and went through some trouble to remove it.  This was a Friday.  On Saturday he left town and on Sunday Trivedi showed up again to see Rustum in person at the lab, directed to do so by his "guiding voice," as if the entity had to reassert its presence and dominance here.  I refused to partake in that meeting.

Thereafter, Rustum began to ail with one thing after another, but most notably a terrible pain at the base of his spine.  All kinds of testing failed to reveal the source of his agonizing pain.  He continued to get "blessings" through February or so, after which he seemed to really cool it on his support for Trivedi, for various reasons.  He passed his 86th birthday in early July 2010 in a wheelchair, on pain-killers.  In the end, they said it was bone cancer that metastasized: cancer was throughout his body and he passed away on August 26, 2010 – easy for me to remember as it was coincidentally my father's birthday.

My colleague, Dr. Phil Shinnick, who visited Rustum several times in June and July to offer pain relief through acupuncture, a TENS unit and other methods, said he had had several patients with bone cancer, and he knew very well how that would show up on the medical scans.  He said, "Tania, I looked at Rusty's scans and there was NO TRACE of bone cancer.  Cancer may have shown up at the very end, but it was NOT the cause of his death.  It was really as if something just sucked the life energy out of him."

The pain Rustum suffered was at the base of the spine.  This is the seat of the Kundalini life-force energy.  In one year, this vital man shriveled away and is believed to have died of cancer.  Is this was Trivedi's "blessings" did to him?

ECF No. 76-1 at 68-73.

10

There are three versions of the "overview" in the record.  ECF No. 76-1 at 68-73; 75-78 and 80-83.  The second version does not contain the references to the devil or an 'evil spirit.'  The second version also does not insinuate that Trivedi's blessings were casually related to Dr. Roy's death.  The third version is in print too minuscule for the Court to decipher.

## 2.  The email

On July 28, 2011, Dr. Slawecki sent an email to Heather McKinney and Julie March.  ECF No. 76-1 at 85-87.  Heather McKinney was a Penn State colleague of Dr. Slawecki's.  Julie March had been an employee of Trivedi's.   The email states:

> Dear Heather and Julie -
>
> Thanks for sharing this info, Heather! And Julie, I hope you are doing well.  I never expected to be suffering the aftershocks of our having had tested the infamous "guruji" here, but, alas, I'm in the unfortunate posititon of being the sole person to defend the fact that (a) we found NOTHING to scientifically validate Trivedi and (b) Rustum Roy rescinded his support of Trivedi before Rusty died in August of last year.
>
> The rest of this note is addressed to Julie:
>
> MANY people are now coming forward and speaking out about the lies and deception of Trivedi and his so-called Foundation.  They are scamming people and Trivedi himself keeps abusing women in horrible ways.  The more voices speaking up, the better chance we have of putting a stop to this horror.  The Trivedi Foundation also made $6.3 Million between November 2010 and July of this year, and he's hit the big-time movie star circuit.  How I wish Dr. Susan Lark would have

shared her note (see below) with more people when she discovered Trivedi's "true" nature.

While it is unpleasant for all of us to have to even think about this creep, I hope you will take the time to lend your voice in support of all of those who are trying to stop him.  Many women have worked for his foundation and left - not walking, but RUNNING from these guys.  No one really wants to revisit it, but they count on that.  Please visit www.purqi.com or www.purqi.org where a former employee of the Trivedi Foundation is keeping tabs on what is happening and trying to apprise the public.  My statement is posted at htt;://www.purqi.com/Penn_State_Trivedi.html, and contains subjective commentary that I omitted from my www.personal.psu.edu/tms9/trivedi.html posting on my Penn State website.

When I heard you abandoned Trivedi in AZ, I realized something had gone awry.  I found him to be obnoxious, condescending to women, rude, demanding and generally unspiritual, totally obsessed with his own "powers" and never speaking of "love"...and I thought he was so awful, I was certain you and others would quickly see through his charade - but because Rusty was so impressed with all the "data" that supposedly backed him (and my postings critique this bad data), and because Rusty SO WANTED to proved [sic] that this was real, he was blinded by his own desires and promoted Trivedi.  Those professionals, like Chopra and Ken Wilber, who trusted Rusty's scientific word, never independently looked at Trivedi themselves...they just jumped onto the promotional bandwagon.

In general, when we find "null results" on samples or people, we don't embarrass them - as a courtesy, we don't say anything.  Rusty took scant data we had that turned out to be instrumentation problems, and used that time little bit of bad data to claim "Guruji changed water!" He and I had some strong words with each other on several occasions over his using this data in ways I felt were misleading and unethical.  He finally saw through Trivedi after the big Scientists and Sages event in Feb 2010, after which Rusty's health declined precipitously and he focused on

wrapping up his life rather than denouncing Trivedi.

I would have never said anything except that a few months ago, a report[er], Dennis Lang, contacted me to validate that we tested Trivedi here at Penn State and he wanted to know what we found. He was stunned when I said yes, we tested him extensively, but we found NOTHING. I explained how instrumentation glitches caused Rusty to believe for some time that we HAD seen water change from Trivedi's blessing, but ultimately I remember Rusty sitting back in his chair and saying, "Huh! So we really don't have any data that shows he changed water...Well, maybe it is just that his blessing only affects living things." Rusty was very impressed with the agricultural data (of which he was not expert and easily duped). I saw through that too, as I mentioned in my critiques posted. But I didn't go up against him with that.

So it is really Dennis Lang, the reporter, who has dug and dug and ultimately been the one who has connected us all - many women who were mislead by the "scientific proof" to believe in Trivedi and suffered abuses in his employ - and we're banding together and stepping forward.

We now know Trivedi is taking human growth hormone injections which is what causes his pituitary to be enlarged, causes him to need to drink all that water, increases his virility and makes him irritable and nasty. Thus the data shows his cartilage is like that of a 20 yr old is true because this is an effect of the HGH. He pretends to be celibate but is driven to sex because of taking HGH. One 19 yr old girl he sexually abused, he beat her up so badly she wound up in the hospital. Her father pulled her out of the group and they are now pressing charges against Trivedi.

Trivedi is working on a visitor's visa! How this can be permitted is a mystery to me...why hasn't the immigration department deported him? Of course we'd rather have him jailed than deported. He's doing a lot of illegal stuff...and he gets his "Revenge" on people by hiring these computer hackers from India to try to hack into your personal stuff and make problems for you. I was told that they forced one 25 yr old guy to work 18 hr days for three weeks to write a code that would double or triple charge their event fees to people's credit cards when people

registered for his "Healing Retreat Workshop" or other events (even "blessings for which he now charges).  The code was written in such a way as to make it very hard for people to remove the charges from their credit cards.  This is one way they make their money.  Trivedi is wearing $6000 suits and driving expensive cars.  So much for that "I cannot accumulate wealth" mantra he used to portray himself...

I told Dennis Lang about your visit to our lab with Trivedi in July 2009 and your subsequent abandonment of him in a remote place in Arizona. We'd love to hear your story if you're willing to share.  Anything you wish to remain confidential certainly well [sic], but many are posting their experiences on the www.purqi.com website now to use it to warn others.

Michele at Purqi.com is interested in developing her website as an educational forum on spiritual matters - to educate the gullible public so that no one else falls for another self-proclaimed "guruji." I anticipate sharing info on good laboratory protocols and common things that produce results that make you think something "real" is there...but with subsequent careful testing, you find out where the error occurred and prove, in fact, there is nothing there.

We HAVE had several people we tested at our lab who DID do extraordinary things.  Trivedi was NOT one of them.

Julie, I hope you will add your voice to ours to not only warn others, but to help build our collective strength.  One of his former employees is dedicated to "bringing him down."  She would benefit from your testimony as well.  She has two attorneys she is working with and I am providing her with all the scientific data and reports I have that showed we saw nothing.

Thanks for your time and consideration of my request.  Take care and watch out for the creepos of the world! ☺

Kind regards,
~ Tania

14

p.s. we're trying to find info on his ex-wife from India.  He said she lives
in the U.S. and he has a son by her.  Assuming he wasn't making that up,
we're trying to locate them for more info on his early work and life in
India.  Any leads would be appreciated.

ECF No. 76-1 at 85-87.

Dr. Slaweki wrote in a later email to Dennis Lang that she intended the

email to be a private communication and she did not intend for Julie March to

disseminate it.  ECF No. 76-1 at 88.  She further wrote "there was a tiny part of me

that questioned whether or not this was the right thing to do..."  *Id.*  "I have an iron

conscience and this will haunt me for the rest of my life.  I know I stooped to the

level of gossip..."  *Id.*  Julie March acknowledged in an email to Dr. Slawecki that

she had disseminated Dr. Slawecki's July 28, 2011 email, stating, "Basically, I can

take accountability that I forwarded an email without knowing it was meant to be

confidential."  ECF No. 76-1 at 92.

Mr. Trivedi asserts that "all [of Dr. Slawecki's] implications are false, "

including Dr. Slawecki's accusations of sexual abuse.    ECF No. 76-1 at 4,

Affidavit of Mahendra Kumar Trivedi.

Kathleen V. Yurchak, Esquire, counsel for plaintiffs, clarified in oral

argument before the Honorable Yvette Kane, to whom this matter was previously

assigned, that Count I, defamation, is based only on the accusation of sexual

misconduct.  ECF No. 32 at 18.  Additionally, the amended complaint only alleges

15

the sexual misconduct statement as a basis for the defamation claim.  ECF No. 31

at -8.  Mr. Trivedi has denied having a sexual relationship with any of his

employees.  ECF No. 70-1 at 9.   Mr. Trivedi also asserts that no criminal charges

have been filed against him, no civil liability has been alleged/imposed, and he has

made no settlement agreements for sexual misconduct and/or physical abuse.  ECF

No. 70-2 at 16-17, Pl.'s Amended Responses to Df.'s First Set of Interrogatories.

*3.  Damages*

> Mr. Trivedi asserts that,

> Slawecki's actions have caused (a) certain writers, supporters and
> affiliates to withdraw their public support for or endorsements of myself,
> Trivedi Foundation and Trivedi Master Wellness, LLC, (b) certain
> affiliates to cancel interviews and conferences at which Trivedi's Energy
> Transmissions would be offered, (c) discord amongst Plaintiffs'
> employees, all of which caused damages in the form of lost business and
> business opportunities and (d) loss of participants in my programs.

ECF No. 76-1 at 4, Affidavit of Mahendra Kumar Trivedi.

Mr. Trivedi named seven affiliates who stopped doing business with him.

ECF No. 70-2 at 20, Pl.'s Amended Responses to Df.'s First Set of Interrogatories.

These seven entities form the basis of the interference with contractual relations of

affiliates claim, Count II.   Mr. Trivedi named four employees who stopped doing

business with him. ECF No. 70-2 at 20, Pl.'s Amended Responses to Df.'s First Set

of Interrogatories.  These four employees form the basis of the interference with

contractual relations of employees claim, Count III.   There is no evidence that Dr. Slawecki directly contacted any of Trivedi's affiliates.  ECF No. 68 at ¶ 10.

According to deposition testimony of Alice Branton, the Chief Executive Officer of Trivedi Global, Inc. (and formerly the Vice President for Business Development for Trivedi Master Wellness), the Trivedi Foundation "collected around $65,000" in 2009; in 2010 "it was very close to $2.4 million;" and for 2011 "it collected revenue" of $3.5 million.  ECF No. 70-1 at 6.  Additionally, in 2011 Trivedi Master Wellness was created, and that "collected around $5 million" that year.  ECF No. 70-1 at 6-7.  Ms. Branton went on to state, "[a]nd in 2012, our revenue was $4.5 million, because whatever Tania Slawecki, she did, right, with the whole group.  So the revenue started coming down: 2012, $4.5 million; 2013, $3.2 million."  ECF No. 70-1 at 7.

*4.  Abuse of Process Counterclaim*

Dr. Slawecki alleges that Trivedi has abused process by filing multiple lawsuits in multiple jurisdictions against her.

**B. Standard of Review**

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the moving party bears the burden

of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The

movant meets this burden by pointing to an absence of evidence supporting an

essential element as to which the non-moving party will bear the burden of proof at

trial. *Id.* at 325. Once the moving party meets its burden, the burden then shifts to

the non-moving party to show that there is a genuine issue for trial. Fed. R. Civ. P.

56(e). An issue is "genuine" only if there is a sufficient evidentiary basis for a

reasonable jury to find for the non-moving party, and a factual dispute is "material"

only if it might affect the outcome of the action under the governing law. *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202

(1986).

In  opposing summary judgment, the non-moving party "may not rely

merely on allegations or denials in its own pleading; rather its response must … set

out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The

non-moving party "cannot rely on unsupported allegations, but must go beyond

pleadings and provide some evidence that would show that there exists a genuine

issue for trial." *Jones v. United Parcel Service*, 214 F.3d 402, 407 (3d Cir. 2000).

Arguments made in briefs "are not evidence and cannot by themselves create a

factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent.*

18

*Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

However, the facts and all reasonable inferences therefrom must be viewed in the

light most favorable to the non-moving party. *P.N. v. Clementon Bd. of Educ.*, 442

F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement

about the facts or the proper inferences that a factfinder could draw from them.

*Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982). Still, "the

mere existence of some alleged factual dispute between the parties will not defeat

an otherwise properly supported  motion for summary judgment; there must be a

genuine issue of material fact to preclude summary judgment." *Anderson*, 477 U.S.

at 247-48.

### C. Analysis:

*1.  Count I Defamation*

Dr. Slawecki argues that she is entitled to summary judgment on the

defamation claim because, as Plaintiffs are limited purpose public figures, Dr.

Slawecki can only be liable if she had acted with actual malice; Plaintiffs cannot

show the falsity of the alleged defamatory statement; and she is entitled to a

conditional privilege with respect to the allegedly defamatory email.  Morevoer,

Dr. Slawecki argues that the demand for attorneys fees at Count I is not

permissible pursuant to Pennsylvania law.

In response, Trivedi argues that there are material facts in dispute that would defeat the motion for summary judgment; actual malice exists; Dr. Slawecki's statements are defamation *per se*; and there is a basis for punitive damages.

""Defamation," of which libel, slander, and invasion of privacy are methods, is the tort of detracting from a person's reputation, or injuring a person's character, fame, or reputation, by false and malicious statements." *Cogley v. Duncan*, 32 A.3d 1288 (Pa. Super. Ct. 2011).  "In an action for defamation, the plaintiff has the burden of proving ... [t]he defamatory character of the communication." *Tucker v. Philadelphia Daily News*, 848 A.2d 113, 123 (Pa. 2004), *citing* 42 Pa.C.S. § 8343(a).

Pennsylvania law sets out the elements of both the claim and defense as follows:

> (a) Burden of plaintiff.--In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:
>> (1) The defamatory character of the communication.
>> (2) Its publication by the defendant.
>> (3) Its application to the plaintiff.
>> (4) The understanding by the recipient of its defamatory meaning.
>> (5) The understanding by the recipient of it as intended to be applied to the plaintiff.
>> (6) Special harm resulting to the plaintiff from its publication.
>> (7) Abuse of a conditionally privileged occasion.

(b) Burden of defendant.--In an action for defamation, the defendant has the burden of proving, when the issue is properly raised:

(1) The truth of the defamatory communication.

(2) The privileged character of the occasion on which it was published.

(3) The character of the subject matter of defamatory comment as of public concern.

42 Pa. Cons. Stat. Ann. § 8343.

However, despite Pennsylvania's statue placing the burden of proving truth in a defamation action in on the defendant, the burden on truth/falsity is shifted to the plaintiff when the plaintiff is a public figure.  Counsel at oral argument conceded that Plaintiffs are limited-purpose public figures.

The standard of review for a public figure and a limited purpose public figure are the same.   "[A] public-figure plaintiff must show the falsity of the statements at issue in order to prevail in a suit for defamation." *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775, 106 S. Ct. 1558, 1563, 89 L. Ed. 2d 783 (1986); *See Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964) (reading *Sullivan* for the proposition that "a public official [is] allowed the civil [defamation] remedy only if he establishes that the utterance was false"). *See also Herbert v. Lando*, 441 U.S. 153, 176, 99 S.Ct. 1635, 1648, 60 L.Ed.2d 115 (1979) ("[T]he plaintiff must focus on the editorial process and prove a false publication attended by some degree of culpability").

"It is the function of the court to determine whether the challenged publication is capable of a defamatory meaning." *Tucker*, 848 A.2d at 124.

"If the court determines that the challenged publication is not capable of a defamatory meaning, there is no basis for the matter to proceed to trial." *Id., citing Thomas Merton Center v. Rockwell International Corp.*, 442 A.2d 213, 215-16 (Pa. 1981). "To determine whether a statement is capable of a defamatory meaning, we consider whether the statement "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third parties from associating or dealing with him." *Id. citing Birl v. Philadelphia Elec. Co.*, 167 A.2d 472, 475 (Pa. 1960) (quoting Restatement (First) of Torts, § 559 (1989). "It is not enough that the victim of the [statements] ... be embarrassed or annoyed, he must have suffered the kind of harm which has grievously fractured his standing in the community of respectable society." *Id. citing Scott-Taylor, Inc. v. Stokes*, 229 A.2d 733, 734 (Pa. 1967).

Plaintiffs would have the burden at trial of showing that Dr. Slawecki's statement was made with 'actual malice' and are false. "[T]he appropriate standard of fault depends on whether the plaintiff is a public or private figure." *Am. Future Sys., Inc. v. Better Bus. Bureau of E. Pennsylvania*, 923 A.2d 389, 400 (Pa. 2007), *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 343 (articulating that "the state

interest in compensating injury to the reputation of private individuals requires a different rule should obtain with respect to them"    as compared to public figures). "If the plaintiff is a public official or public figure, *see Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 164, 87 S.Ct. 1975, 1996, 18 L.Ed.2d 1094 (1967) (extending the actual malice requirement to public figures who are not governmental officials), and the statement relates to a matter of public concern, then to satisfy First Amendment strictures the plaintiff must establish that the defendant made a false and defamatory statement with actual malice." *Id.* Actual malice is "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S. Ct. 710, 726, 11 L. Ed. 2d 686 (1964).

At trial, Trivedi must "prove by clear and convincing evidence that the allegedly defamatory statements were false and that [Dr. Slawecki] either knew they were false or recklessly disregarded their falsity." *Tucker* 848 A.2d at 128. "[T]he requirement that the plaintiff be able to show actual malice by clear and convincing evidence is initially a matter of law." *Id.* at 130.  "'The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law.'" *Id.* (*quoting Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 685-86, 109 S.Ct. 2678, 105

L.Ed.2d 562 (1989)).

> The sufficiency of the evidence to support a jury's finding of actual malice is a question of law, *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 109 S.Ct. 2678, 2694, 105 L.Ed.2d 562 (1989), and a court reviewing such a finding is required to "exercise independent judgment and determine whether the record establishes actual malice with convincing clarity," *id.* (*quoting Bose Corporation v. Consumers Union*, 466 U.S. 485, 514, 104 S.Ct. 1949, 1967, 80 L.Ed.2d 502 (1984)). Our duty in this regard is constitutionally based, id., and derives from "[o]ur profound national commitment to the free exchange of ideas, as enshrined in the First Amendment" *Id.*

> "Judges, as expositors of the Constitution," have a duty to "independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."" *Id. (quoting Bose Corporation v. Consumers Union*, 466 U.S. at 511, 104 S.Ct. at 1965).

*Fitzpatrick v. Philadelphia Newspapers, Inc.,* 389 Pa. Super. 438, 443-44, 567 A.2d 684, 687 (1989)

From the evidence provided to the Court, it appears that Plaintiffs may be able to produce enough evidence at trial to convince a reasonable jury of the first five factors set forth at 42 Pa. Cons. Stat. Ann. § 8343.

Defendant argues that plaintiffs haven't proved the falsity of the allegations, plaintiffs have failed to prove the lack of privilege, and defendant further argues that plaintiffs haven't shown actual malice by clear and convincing evidence.

The matter therefore turns on two points: the existence, or lack thereof, of "actual malice" and plaintiffs setting forth some evidence to show that the

allegations are false.  The Court must consider whether a reasonable jury could conclude by clear and convincing evidence that Dr. Slawecki knew the statements were false or wrote them with a reckless disregard of their falsity.

Dr. Slawecki testified at her deposition that there were two reasons that she sent the email (that was quoted verbatim above).  The first, is that "I knew Julie had fled Mr. Trivedi, abandoned him at a hotel, for reasons that were unknown to me." ECF. No. 76-1 at 62.  Dr. Slawecki went on to say,  "The second factor...was that I had learned [from the reporter, Dennis Lang] that abuses to women had occurred in Mr. Trivedi's employ." *Id.*

Defendant's brief indicates that Dr. Slawecki had heard the information about the allegations of sexual abuse of a 19 year old girl from both the reporter, Dennis Lang, as well as from a former employee of Trivedi's, Gloria Zamora.

As the Superior Court of Pennsylvania observed in a case of recent vintage:

> The burden of proof imposed is substantial, as "[t]he actual malice standard goes so far as to forbid imposition of liability even in those instances where the defendant negligently publishes false, defamatory statements about a public figure or public official."   *Norton v. Glenn*, 580 Pa. 212, 860 A.2d 48, 56 (2004), *cert. denied*, 544 U.S. 956, 125 S.Ct. 1700, 161 L.Ed.2d 539 (2005). Indeed, "[f]ailure to check sources, or negligence alone, is simply insufficient to maintain a cause of action for defamation. Recklessness generally and in the context of actual malice is not easily shown."   *Tucker, supra*, at 135. Moreover, establishment of a defamation claim requires clear and convincing evidence, the highest level of proof for civil claims. *Bartlett v. Bradford Publishing, Inc.*, 885 A.2d 562, 566 (Pa.Super.2005) (citation omitted).

25

A showing of actual malice requires "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."  *Curran v. Philadelphia* Newspapers, Inc., 376 Pa.Super. 508, 546 A.2d 639, 642 (1988), *appeal denied*, 522 Pa. 576, 559 A.2d 37 (1989) (*quoting St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)).

*Blackwell v. Eskin*, 2007 PA Super 20, 916 A.2d 1123, 1125-26 (2007)

Black's Law Dictionary defines negligence as "[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation; any conduct that falls below the legal standard established to protect others against unreasonable risk of harm, except for conduct that is intentionally, wantonly, or willfully disregardful of others' rights.  The term denotes culpable carelessness."  BLACK'S LAW DICTIONARY (9th ed. 2009).

Black's Law Dictionary defines recklessness as "1.  [c]onduct whereby the actor does not desire harmful consequence but nonetheless foresees the possibility and consciously takes the risk.  Recklessness involves a greater degree of fault than negligence but a lesser degree of fault than intentional wrongdoing.  2. The state of mind in which a person does not care about the consequences of his or her actions.  The ordinary meaning of the word [recklessness] is a high degree of carelessness.  It is the doing of something which in fact involves a grave risk to others, whether the doer realizes it or not. The test is therefore objective and not subjective.  BLACK'S LAW DICTIONARY (9th ed. 2009).

Although the terms negligence and recklessness seem easily defined, they

are not easily applied.  It has been aptly said that,

> The continuum of fault from negligence to gross negligence to wanton
> or willful conduct to recklessness is highly malleable. In particular, the
> phrase "gross negligence" has been characterized by the Tennessee
> Supreme Court as "Nothing more than negligence with the addition of
> a vituperative epithet"... [the] escalation of pejorative labels
> unnecessarily complicates some trials and heightens the probability of
> emotional pleas to the jury.

 C. Mutter, MOVING TO COMPARATIVE NEGLIGENCE IN AN ERA OF TORT REFORM:

DECISIONS FOR TENNESSEE, 57 Tenn.L.Rev. 199, 211 (1990).

It is a formidable task for the Court to determine as a matter of law where on

the continuum Dr. Slawecki's actions stood.  With this in mind, the undersigned

turns to the facts presented by the parties. The Court finds that Plaintiffs simply

have not set forth enough evidence for a reasonably jury to find by *clear and

convincing evidence* that Dr. Slawecki acted recklessly.  To the contrary, Plaintiffs

have merely set forth evidence to show that Dr. Slawecki acted negligently.

Dr. Slawecki heard gossip about Mr. Trivedi through multiple sources, as

delineated above.  Dr. Slawecki failed to exercise the care that a reasonably

prudent person may have taken, in not repeating that gossip.  Plaintiffs have not,

however, set forth anything to demonstrate to this Court that Dr. Slawecki

recklessly spread information that she believed to be false.  Plaintiff's "[e]vidence

27

may be sufficient to support a finding of negligence in failing to discover misstatements, but constitutionally insufficient to show the recklessness required for a finding of actual malice." *Fitzpatrick*, 567 A.2d at 689 (1989), (*citing New York Times v. Sullivan*, 376 U.S. at 288, 84 S.Ct. at 730).

Moreover, and most notably,  plaintiffs have not provided any evidence from the young woman alleged to have been a sexual abuse victim to show that the allegations were false.  Public figure plaintiffs have the burden of proving the falsity of the statement at trial.  *See New York Times v. Sullivan, supra.*  In attempting to defeat summary judgment, deposition testimony or an affidavit from this young woman would be a key piece of evidence the plaintiffs would need both for the purposes of the instant motion and for trial.  Trivedi has provided scant evidence, essentially nothing aside from his own affidavit, to say that the allegation was false.   "As a general proposition, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.""" *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012), *citing Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir.2009) (citation omitted) (internal quotation marks omitted); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).  The plaintiffs' lack of evidence showing falsity of the statement is glaring and falls well short of the clear

28

and convincing evidence standard.[3]   Consequently, the Court holds that a

reasonable jury could not conclude by clear and convincing evidence that Dr.

Slaweci acted with actual malice when writing the email at issue.

### 2. Counts II and III Tortious Interference with Contractual Relations: Affiliates, Employees, and others

As to Count II, Dr. Slawecki argues that she is entitled to summary judgment

on the tortious interference with contractual relations - affiliates claim because

Plaintiffs have not provided any evidence that the six identified affiliates ceased

doing business with them because of the statements by Dr. Slawecki; Mr. Trivedi

failed to attribute a specific monetary loss because of the affiliates' refusal to do

business with Plaintiffs; there is no evidence to support a punitive damages

demand; and there are no allegations that would entitle Plaintiffs to attorneys' fees.


As to Count III, Dr. Slawecki argues that she is entitled to summary

judgment on the tortious interference with contractual relations - employees and

others claim because Plaintiffs only identified one employee, Cindy Sparks,  in the

complaint who alleges that she declined to continue to work for Plaintiffs because

---

[3]Not only did Plaintiffs provide nothing from the young woman regarding these allegations, but Defendants succeeded in providing emails from two young women who claimed that Mr. Trivedi, had, in fact, sexually abused them.

29

of Dr. Slawecki's conduct; Plaintiffs have produced no evidence to establish that

Sparks terminated her employment with Plaintiffs because of Dr. Slawecki's

conduct; Plaintiffs have failed to produce any evidence that a client, Kristen

Stewart, declined to be associated with Plaintiffs as a result of Dr. Slawecki's

actions;  there is no evidence to support a punitive damages demand; and there are

no allegations that would entitle Plaintiffs to attorneys' fees.

In response, Trivedi argues that there are material facts to defeat the motion

for summary judgment.

> The elements of a cause of action for intentional interference with a
> contractual relation, whether existing or prospective, are as follows:
>
>> (1) the existence of a contractual, or prospective contractual
>> relation between the complainant and a third party;
>> (2) purposeful action on the part of the defendant, specifically
>> intended to harm the existing relation, or to prevent a
>> prospective relation from occurring;
>> (3) the absence of privilege or justification on the part of the
>> defendant; and
>> (4) the occasioning of actual legal damage as the result of the
>> defendant's conduct.

*Blackwell v. Eskin*, 2007 PA Super 20, 916 A.2d 1123, 1127-28 (2007) *citing*

*Reading Radio, Inc. v. Fink*, 833 A.2d 199, 211 (Pa.Super.2003), *appeal denied*,

577 Pa. 723, 847 A.2d 1287 (2004) (*quoting Strickland v. University of Scranton*,

700 A.2d 979, 985 (Pa.Super.1997)).

As to the first element,

> A "prospective contractual relationship" is something less than a contractual right, something more than a mere hope. Under Pennsylvania law, [Plaintiffs] must present adequate proof of an objectively reasonable probability that a contract will come into existence. [Plaintiffs] need only demonstrate that it is reasonably probable that it would have obtained a contract, not that it was guaranteed to do so. Stated another way, [Plaintiffs] may recover if, but for [defendant's] wrongful acts, it is reasonably probable that a contract would have been entered. This reasonable probability may result from an unenforceable express agreement, an offer, or the parties' current dealings, but not merely from prior dealings or an existing business relationship between the parties.

*Baier v. Jersey Shore State Bank*, No. 4:07-CV-2236, 2009 WL 2843325, at *17

(M.D. Pa. Aug. 31, 2009) (McClure, J.) (internal citations and quotations omitted).

"It is not enough for a plaintiff to show merely that defendant's actions had

the incidental consequence of affecting plaintiff's business relationships with third

persons." *Devon Robotics v. DeViedma*, No. 09-CV-3552, 2012 WL 3627419, at

*16 (E.D. Pa. Aug. 23, 2012) (Joyner, J.) "A plaintiff must show that the

defendant acted for the malevolent purpose of interfering with the plaintiff's

existing ... business relationships." *Id. citing Valley Forge Convention & Visitors*

*Bureau v. Visitor's Servs., Inc.,* 28 F.Supp.2d 947, 951 (E.D.Pa.1998).

"The second element requires proof that the defendant acted for the specific

purpose of causing harm to the plaintiff." *Phillips v. Selig*, 2008 PA Super 244,

959 A.2d 420, 429 (2008) (internal citations omitted).    The wrong ordinarily

requires conduct intended to interrupt negotiations or prevent the consummation of

a contract." *Orange Stones Co. v. City of Reading,* 87 A.3d 1014, 1025 (Pa.

Commw. Ct. 2014) (*citing Glenn v. Point Park College*, 441 Pa. 474, 481, 272

A.2d 895, 899 (1971)).  "[T]he second prong is satisfied if defendant acts

improperly and with the knowledge that such interference is substantially certain to

occur."  *Id. citing* RESTATEMENT (SECOND) OF TORTS § 766 cmt. j; § 766B cmt. d

(1979).

"The third element requires proof that the defendant's actions were improper

under the circumstances presented. *Phillips v. Selig*, 959 A.2d 420, 429 (Pa. Super.

2008).    "The presence of a privilege is not an affirmative defense, rather, the

absence of such a privilege is an element of the cause of action which must be

pleaded and proven by the plaintiff." *Synthes, Inc. v. Emerge Med., Inc*., 2014 WL

2616824, at *19 (E.D. Pa. June 11, 2014) *citing Bahleda v. Hankison Corp.*, 323

A.2d 121, 122-123 (Pa.Super.1974).

"Whether a defendant is privileged or justified in a particular course of

conduct is defined by "the rules of the game," or the "area of socially acceptable

conduct which the law regards as privileged. *Orange Stones Co.,* 87 A.3d at 1025,

*citing  Glenn v. Point Park College*, 441 Pa. 474, 482, 272 A.2d 895, 899 (1971).

32

Pennsylvania has adopted the Restatement Second of Torts proposition that

the interference must be improper, i.e., without privilege or justification. *See*

*Empire Trucking Co., Inc., v. Reading Anthracite Coal Co.*, 71 A.3d 923 (Pa.

Super. 2013).   To determine impropriety includes consideration of:

> (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the others with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties.

RESTATEMENT (SECOND) OF TORTS § 767, *and see, Phillips*, *supra* ([The] third

element...is determined in accordance with the factors listed in Restatement section

767).

In applying these factors, comment b to section 767 is also instructive:

> The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation. This Section states the important factors to be weighed against each other and balanced in arriving at a judgment; but it does not exhaust the list of possible factors.

Restatement (Second) of Torts § 767 cmt. b (1979). In making this

choice of values in individual cases, our Supreme Court has advised that

when the purpose of the defendant's conduct is, in whole or in part, to

protect a legitimate right or interest that conflicts with the interests of the

> plaintiff, a line must be drawn and the interests evaluated.    Although
> this evaluation of interests is not always susceptible of "precise
> definition," it is clear that the central inquiry is whether the defendant's
> conduct is sanctioned by the "rules of the game" which society has
> adopted.  *Id.*

*Phillips*, 959 A.2d at 430 (2008) (internal citations omitted).

Strikingly, the *only* evidence plaintiffs relied on to defeat summary judgment on this claim is a two-page affidavit from Alice Branton,  the Chief Executive Officer of Trivedi Global, Inc. (and former Vice President for Business Development for Trivedi Master Wellness).  Ms. Branton named twenty-three "key employees, affiliates, volunteers and clients" "who left due to Tania Slawecki's allegations." ECF No. 76-1 at 128-9.  Ms. Branton also named another employee who "[a]t the time Slawecki was making her allegations (March 2011), Gloria Zamora started her litigation after resigning with [sic] the Trivedi Foundation[,] and was considered a hostile employee."

"Under Pennsylvania law, [Plaintiffs] must present adequate proof of an objectively reasonable probability that a contract will come into existence" *Baier, supra*.  "[Plaintiffs] need only demonstrate that it is reasonably probable that it would have obtained a contract, not that it was guaranteed to do so." *Id.*  "Stated another way, [Plaintiffs] may recover if, but for [defendant's] wrongful acts, it is reasonably probable that a contract would have been entered." *Id.*  "This

reasonable probability may result from an unenforceable express agreement, an offer, or the parties' current dealings, but not merely from prior dealings or an existing business relationship between the parties."

Trivedi has offered no evidence of either existing or prospective contracts. There were no contractual documents provided to defeat summary judgment to show the existence of a contract with these named individuals. Nor was any evidence adduced of a prospective contract, such as an offer or negotiation documents. No facts were presented to defeat the summary judgment motion; Plaintiffs merely set forth the unsupported opinion of one employee who stated that twenty-four people left the Trivedi enterprises because of Slawecki's statements, including one employee who apparently began litigation against Trivedi approximately three months before Slawecki wrote the "overview" internet post and the email at issue. In other words, Trivedi has responded with no facts that create a genuine issue for trial.

In opposing summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather its response must … set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine

issue for trial." *Jones v. United Parcel Service*, 214 F.3d 402, 407 (3d Cir. 2000).

Arguments made in briefs "are not evidence and cannot by themselves create a

factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent.*

*Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

Because the decision to grant summary judgment rests on the first factor of

these two claims, the court need not address the remaining factors.

### 3.  *Abuse of Process counterclaim*

Dr. Slawecki asserts in her motion for summary judgment, ECF No. 64, that

the undisputed facts show that she is entitled to summary judgment on her abuse of

process counterclaim against Plaintiffs.  However, Dr. Slawecki made no mention

of the abuse of process claim in either her brief supporting the motion, ECF No.

70, or in her reply brief, ECF No. 77.

Accordingly, because Defendant made no argument for plaintiffs to respond

to, insofar as the motion is for summary judgment on Defendant's counterclaim,

the Court deems it to have been abandoned by Defendant.

## III.  CONCLUSION:

Defendant's Motion for Summary Judgment on Counts I, II, and III, will be

granted.

Insofar as Defendant's Motion for Summary Judgment is a motion for

judgment in her favor on her counterclaim, it will be denied.


BY THE COURT:


 s/ Matthew W. Brann
Matthew W. Brann
United States District Judge